**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**U.S. POSTAL SERVICE, Respondent,**

**and**

**American Postal Workers Union, AFL–CIO (APWU); National Association of Letter Carriers, AFL–CIO (NALC), Intervenors.**

**No. 86–7403.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 6, 1987.

Decided Sept. 4, 1987.

John D. Burgoyne and Mark McCarty, Washington, D.C., for petitioner.

Stephen E. Alpern and Jessie L. Butler, Washington, D.C., for respondent.

Arthur M. Luby, Washington, D.C., for intervenor, American Postal Workers Union.

Keith E. Secular, New York City, for intervenor, National Ass'n of Letter Carriers.

Laurence E. Gold, Washington, D.C., for amicus curiae mail handlers.

Before WALLACE, FLETCHER and BRUNETTI, Circuit Judges.

WALLACE, Circuit Judge:

The National Labor Relations Board (Board) applies for enforcement of its order that the United States Postal Service (Postal Service) honor an employee's revocation of his dues-checkoff assignment after he resigns from membership in his union. We have jurisdiction pursuant to 29 U.S.C. § 160(e), and deny enforcement.

I

The Postal Service signed a collective bargaining agreement with the American Postal Workers Union, AFL–CIO (union). The agreement states that the Postal Service "shall deduct and remit to the appropriate Union the regular and periodic Union dues from the pay of employees who are members of such Union" provided that the Postal Service has received a written assignment from each employee.

Dalton is an employee of the Postal Service and was a member of the union. In October 1982, Dalton executed and delivered an authorization and assignment (Authorization) which read as follows:

### AUTHORIZATION FOR DEDUCTION OF UNION DUES

UNITED STATES POSTAL SERVICE

I hereby assign to [the Union] from any salary or wages earned or to be earned by me as your employee (in my present or any future employment by you) such regular and periodic membership dues as the Union may certify as due and owing from me, as may be established from time to time by said Union. I authorize and direct you to deduct such amounts from my pay and to remit same to said Union at such times and in such manner as may be agreed upon between you and the Union at any time while this authorization is in effect.

This assignment, authorization and direction shall be irrevocable for a period of one (1) year from the date of delivery hereof to you, and I agree and direct that this assignment, authorization and direction shall be automatically renewed, and shall be irrevocable for successive periods of one (1) year, unless written notice is given by me to you and the Union not more than twenty (20) days and not less than ten (10) days prior to the expiration of each period of one (1) year.

This assignment is freely made pursuant to the provisions of the Postal Reorganization Act and is not contingent upon the existence of any agreement between you and my Union.

By letter dated January 25, 1985, Dalton resigned his membership in the union. Three days later, Dalton notified the Postal Service of his revocation of the Authorization. The Postal Service advised Dalton that it would not honor his revocation because it was not made during the 10-day period designated for revocation in the Authorization.

Dalton filed a charge with the Board. As a result, the General Counsel of the Board issued a complaint against the Postal Service alleging unfair labor practices in violation of sections 8(a)(1) and (2) of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 158(a)(1) & (2). The Board has jurisdiction pursuant to 39 U.S.C. § 1209(b) and 29 U.S.C. § 160(c). The parties agreed to waive a hearing before an administrative law judge and moved to transfer the case directly to the Board for a decision on stipulated facts. The Board granted this motion as well as a motion to intervene brought by the union and the National Association of Letter Carriers (intervenors).

The Board considered the effect of section 1205 of the Postal Reorganization Act (Postal Act), 39 U.S.C. § 1205, which requires the Postal Service to honor an employee's assignment of his wages to pay for periodic union dues. The Board held that the Postal Act "does *not* mandate that checkoff authorizations are irrevocable per se for 1 year irrespective of the nature of

the contractual obligation undertaken by the employee executing the authorization." (emphasis in original). The Board therefore applied what it called "well-established Board principles recognizing that a dues-checkoff authorization that by its terms makes payment of dues a quid pro quo for union membership is revocable by operation of law upon effective resignation from union membership." The Board found that the Authorization signed by Dalton provided for "the payment of dues as a quid pro quo for union membership." Therefore, the Board found that Dalton's assignment of wages was revoked when he resigned from the union, and that the Postal Service violated section 8(a)(1) and (2) of the NLRA by refusing to honor the revocation. The Board ordered the Postal Service to honor the revocation, to refund the dues unlawfully collected from Dalton, and to post an appropriate notice.

The Board applied to us for enforcement of its order. We granted a motion by the intervenors in the Board proceeding to intervene also in the action before this court. We will enforce the Board's order "if the Board correctly applied the law and if its findings of fact are supported by substantial evidence in the record viewed as a whole." *NLRB v. Southern California Edison Co.*, 646 F.2d 1352, 1362 (9th Cir. 1981) (*Edison*).

## II

Our review requires us to interpret section 1205(a) of the Postal Act, which provides:

When a labor organization holds exclusive recognition, ... the Postal Service shall deduct the regular and periodic dues of the organization from the pay of all members of the organization in the unit of recognition if the Post Office Department or the Postal Service has received from each employee, on whose account such deductions are made, a written assignment which shall be irrevocable for a period of not more than one year.

39 U.S.C. § 1205(a). The Board and the Postal Service offer different interpreta-

tions of this provision. We must, therefore, first determine whether we should defer to either of these two interpretations.

When reviewing action by an administrative agency, Congress has commanded generally that "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. Nevertheless, we recognize the "venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969); *accord NLRB v. Hearst Publications Inc.*, 322 U.S. 111, 130, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944); *Edison*, 646 F.2d at 1362. Congress did not state which agency was to be responsible for administering the provisions of section 1205(a). However, the Postal Service points out that the Postal Act is the statute that created the Postal Service and contends that it is charged with administering the provisions of the Act. The Postal Service concludes, therefore, that we should accord deference to its construction of provisions of the Postal Act.

We agree that Congress has charged the Postal Service with administering many or most sections of the Postal Act. Examples include the provisions concerning nonmailable materials, 39 U.S.C. § 3001, fictitious addresses, 39 U.S.C. § 3003, and false representations, 39 U.S.C. § 3005. These statutes regulate matters within the Postal Service's expertise and we would undoubtedly defer to the Postal Service's construction of them. We do not believe, however, that Congress intended for the Postal Service to administer section 1205 as it affects this case. Congress did not delegate to the Postal Service the responsibility for administering all the provisions of the Postal Act. For example, 39 U.S.C. § 1202 gives to the Board, not the Postal Service, the duty of determining the scope of appropriate collective bargaining units in the Postal Service. Similarly, 39 U.S.C. § 1204 places postal union elections in the hands of the Board.

The touchstone for determining whether Congress implicitly delegated authority over a statutory provision to an agency is not, therefore, whether the agency and the provision creating it were enacted on the same day. Far more relevant is whether the agency has expertise and experience with the subject matter of the provision. *See NLRB v. Best Products Co.*, 765 F.2d 903, 908 (9th Cir.1985) ("we give considerable deference to the NLRB's expertise in construing and applying the labor laws"). That Congress delegates to specialized agencies matters within the agency's specialized knowledge is a truism. A court's deference to an agency's interpretation of a statute is the "[d]eference of generalists for the views of specialists." 5 K. Davis, *Administrative Law Treatise* § 29:16, at 400 (1984).

The Board, not the Postal Service, is the agency specializing in labor-management relations. "The function of striking [a] balance [that will] effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board." *NLRB v. Truck Drivers Local Union No. 449*, 353 U.S. 87, 96, 77 S.Ct. 643, 648, 1 L.Ed.2d 676 (1957); *accord International Alliance of Theatrical Stage Employees v. NLRB*, 779 F.2d 552, 555 (9th Cir.1985) (*IATSE*), *cert. denied*, —— U.S. ——, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986). Therefore, "[t]o the extent that the issues involve considerations intrinsic to labor law, we defer to the NLRB's reasonable judgments." *NLRB v. Local Union 497, International Brotherhood of Electrical Workers*, 795 F.2d 836, 838 (9th Cir.1986). Significantly, even the employee-management relations of the Postal Service are subject to the provisions of the NLRA, including Board jurisdiction, to the extent that the NLRA is not inconsistent with the Postal Act. *See* 39 U.S.C. § 1209. Moreover, the Postal Service does not contend that it has experience regulating the subject of section 1205(a), the assignment of wages for labor union dues. By contrast, the Board has regulated wage assignments for some time, and has developed an expertise

in this area. *See, e.g., NLRB v. Penn Cork & Closures, Inc.,* 376 F.2d 52 (2d Cir.), *cert. denied,* 389 U.S. 843, 88 S.Ct. 89, 19 L.Ed.2d 109 (1967). We conclude, therefore, that section 1205(a) of the Postal Act falls within the Board's area of primary administrative authority.

The Postal Service points out, however, that section 1205(a) also authorizes the deduction of dues for management organizations that have "consultation rights" under 39 U.S.C. § 1004(a). These management organizations, unlike labor unions, are not governed by the NLRA and are thereby outside the scope of the Board's authority. *See* 29 U.S.C. §§ 152(3), 164(a); *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974). On this basis, the Postal Service argues that permitting the Board to construe section 1205(a) with respect to labor unions would lead to inconsistent interpretations of the statute. The Board's interpretation would govern traditional labor unions, but another interpretation may apply to management organizations.

This argument, however, does not show that the Board lacks primary authority to construe section 1205(a) with respect to labor unions. The Board is the acknowledged institutional expert on labor relations and its understanding of national labor policy will influence its construction of the statute. If the concerns that motivate the Board's construction of section 1205(a) also arise in the context of management organizations, then the statute should arguably be given the same construction in both contexts. If, however, the regulation of management organizations raises different policy concerns, we would not necessarily find it disconcerting that section 1205(a) was interpreted to apply differently in each context. Interpreting the statute differently as it applies to two different contexts may be the construction that best comports with the intent of Congress.

We hold that we must defer, in the same degree that we defer to the Board's construction of the NLRA, to the Board's construction of section 1205(a) as it affects labor unions. If the Board's interpretation of the statute is "reasonably defensible" we will not reject it merely because we prefer another view. *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979); *IATSE,* 779 F.2d at 555.

## III

The dispute in this case centers on the final clause of section 1205(a) which requires the Postal Service to deduct union dues from the wages of every employee from which it has received "a written assignment which shall be irrevocable for a period of not more than one year." Although the clause is not free of ambiguity, the issue before us does not require that we specifically interpret the language. Instead, we face the narrower question of whether the statute commands that an assignment's irrevocability must continue even after an employee has resigned from the union.

The Board concluded that the Postal Act does not require dues-checkoff assignments to remain irrevocable under these circumstances. Although the statute does not expressly resolve this issue, its plain language supports the Board's construction. Section 1205(a) provides a procedure for collecting, on behalf of a union, the "regular and periodic dues of the organization from the pay of all members." It does not provide a method for collecting money that non-members owe unions. Nor does it provide for collecting moneys from union members for purposes other than dues. When a Postal Service employee has resigned from his union, he is no longer a member and he no longer owes dues. Therefore, collection of moneys other than union dues is not within the explicit ambit of section 1205(a).

An examination of the provision's meager legislative history does not undermine the Board's interpretation. As originally proposed, section 1205(a) had a somewhat broader application. It provided for the assignment of wages for "initiation fees, dues, and assessments." 116 Cong.Rec. H5776 (daily ed. June 18, 1970). Congress then amended it, limiting its application to

dues. *Id.* at H5777. The only relevant inference to be drawn from this amendment is that Congress rejected a broader reach for section 1205(a).

Finally, we do not believe that allowing a revocation of an assignment is inconsistent with the purposes of the irrevocability clause in section 1205(a). Although examining the legislative history sheds no light on the provision's purposes, the parties suggest two plausible goals. First, irrevocability reduces the Postal Service's costs of administering the checkoff system. Postal employees can less frequently revoke and then reassign their wages to pay for union dues. Second, the provision adds a measure of union security. For the period of irrevocability, the union can be certain that dues will not be temporarily withheld to protest some union decision. But if an employee has resigned his union membership, neither one of these purposes is served by continuing the assignment of dues. First, because the employee is no longer a member, the Postal Service does not face the possibility of administering a reinstatement of the checkoff. Second, the union will not have an interest in assuring the collection of dues from the employee because he no longer owes any dues.

We hold, therefore, that the Board's construction of the statute is reasonably defensible: section 1205(a) does not prohibit an employee, who has executed an assignment that is irrevocable for a period, from revoking the assignment upon resignation from the union.

## IV

The Postal Service contends that even if the Board did not err in construing the statute, the Board erred by misinterpreting the Authorization signed by Dalton. The Board applied the following rule: "a resignation will, by operation of law, revoke a checkoff authorization, even absent a revocation request, where the authorization itself makes payment of dues a quid pro quo for union membership." The Board did not explain or justify its rule, but instead cited its earlier decisions which developed the rule. Although the Board is free to formu-

late general rules in the course of adjudicating particular cases, *see SEC v. Chenery Corp.*, 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947), we will set aside such rules if we find them to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Fall River Dyeing & Finishing Corp. v. NLRB*, —— U.S. ——, 107 S.Ct. 2225, 2235, 96 L.Ed.2d 22 (1987) (a Board rule is entitled to deference from the courts if it is "rational and consistent with the [NLRA]"). We therefore must examine the Board's prior decisions to determine whether the rule meets this test.

The rule originated in two cases, *San Diego County District Council of Carpenters (Campbell Industries)*, 243 N.L.R.B. 147 (1979) (*Campbell*), and *Frito-Lay, Inc.*, 243 N.L.R.B. 137 (1979) (*Frito-Lay*). In *Frito-Lay*, the Board considered the effect of dues-checkoff authorizations which "provided that they would be irrevocable except for two escape periods." 243 N.L. R.B. at 139. The Board held that because "the employees did not revoke their authorizations during either of these escape periods, the Union and the Employer were justified in considering the authorizations still valid." *Id.*

In *Campbell*, the Board reached the opposite result. The Board observed that unlike the authorization in *Frito-Lay*, "the dues-checkoff authorization [in *Campbell*] itself states that it is furnished 'in consideration of the benefits received and to be received by [the employee] as a result of [the employee's] membership in the Union.'" 243 N.L.R.B. at 149. "[A]s reflected by the wording of the authorization, the parties agreed to checkoff on the express understanding that union membership with its attendant benefits furnished consideration therefore." *Id.* at 149 n. 9. The Board declared that "[i]n light of the specific language of the authorization we find that an effective resignation from the Local Union also revoked the checkoff authorization by operation of law." *Id.* at 149. The Board offered no explanation or justification as to why the authorization

compelled this result. Instead, the Board merely stated that "[t]he language of the authorizations and the legal import of that language could not be clearer." *Id.* at 149 n. 9.

The Board's rule would be unassailable were the last sentence correct. The principles of administrative law do not require the Board to spell out the reasoning behind a patently obvious conclusion. *Cf. Sears Savings Bank v. Federal Savings and Loan Insurance Corp.*, 775 F.2d 1028, 1029 (9th Cir.1985) (*Sears*) (Board "decision[s] of less than ideal clarity will be upheld if the agency's path may reasonably be discerned"). Unfortunately, to the extent that the "legal import" of the authorization is clear, it compels a result contrary to the result reached by the Board.

The Board has established that a dues-checkoff authorization is a contract between an employee and the employer. *Machinists Local 2045 (Eagle Signal)*, 268 N.L.R.B. 635, 637 (1984) (*Eagle Signal*). In *Campbell*, this contract stated that the authorization was "in consideration of the benefits received and to be received by me as a result of my membership in the Union." 243 N.L.R.B. at 149.

The Board in *Campbell* apparently concluded that the employee's duty to assign his wages to pay membership dues was conditioned on union membership. Although the contract did not explicitly state that the employee's authorization was conditioned on the employer's performance or tendering of performance, such "constructive conditions of exchange" are freely implied. *See* E. Farnsworth, *Contracts* § 8.9, at 579–80 (1982).

But even this implied condition would not lead to the Board's result. Under the contract, the employer promised to tender "the benefits received and to be received" as a result of union membership. *Campbell*, 243 N.L.R.B. at 147. Because of the implied condition, if the employer did not tender these benefits, the employee would no longer have a duty to perform his end of the bargain; thus, the employee could revoke the authorization. But the employer in *Campbell* did not fail to pro-

vide these benefits. Instead, the employee unilaterally declined to accept them—he resigned. A party's duty to perform even a wholly executory contract is not excused merely because he decides that he no longer wants the consideration for which he has bargained. *See generally* 3A A. Corbin, *Corbin on Contracts* § 654, at 136, § 656, at 144–45 (1951); *Restatement (Second)* of Contracts § 75, at 190, Comment a (1981). Therefore, the clear "legal import" of the authorization's language in *Campbell* bound the employee to abstain from revoking the authorization.

We do not suggest that the Board must apply ordinary commercial contract principles when adjudicating labor disputes. Indeed, the Board is not bound by common law contract rules. *See Northwest Administrators v. B.V. & B.R., Inc.*, 813 F.2d 223, 226 (9th Cir.1987). Nor do we suggest that common law principles are always presumptively correct so that the Board cannot depart from them without an appropriate justification. But in *Campbell* the Board purported to give effect to the "express understanding" of the parties as represented by "the specific language of the authorization." 243 N.L.R.B. at 147. The Board acknowledged that the authorization's contractual language was clear and expressly relied on that language's accepted legal import. Therefore, in this case we do not need to decide whether the Board may extract novel consequences from a contract because the Board has not asserted that it desires to do so. Unfortunately, the Board's rule developed in *Campbell* is based on a mistaken view of accepted contract principles.

Furthermore, the Board has failed to correct this error by offering an alternative justification in its decisions following *Campbell*. *See United States Postal Service*, 280 N.L.R.B. No. 169 (August 7, 1986); *Eagle Signal*, 268 N.L.R.B. at 637 & n. 10; *United Steelworkers, Local 7450 (Asarco Inc.)*, 246 N.L.R.B. 878 (1979). From *Campbell* on, the Board grounded its rule on an erroneous view of the requirements of contract law. We hold that the Board has not given a reasoned basis for

its rule, nor does it represent a correct application of the law.

■ Nevertheless, a footnote in the Board's decision presents an alternative approach to the problem of wage assignments of employees who have resigned their union membership. Footnote 5 states: "Member Johansen notes that the same result is reached if we construe the authorization to continue but that, as the amount of dues owed is zero, zero is the amount to be deducted and remitted." We cannot pass judgment on this approach unless it is adopted by the Board. In Board cases, a court cannot affirm on any basis presented in the record, but must instead review only the rationale presented by the Board. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); *Sears*, 775 F.2d at 1029. Although the alternative rationale appears in the Board's decision, it is credited to a single Board member. We hold that a statement explicitly attributed to only a single member of the Board does not represent the view of the Board, even if that statement appears in a decision by the Board. Therefore, we cannot review the alternative presented in footnote 5.

## V

We deny enforcement of the Board's order because it resulted from the application of an improper rule. We will, however, remand this case so that the Board may determine, in light of our opinion, whether to put forward a reasoned basis for its rule, adopt the approach in footnote 5 of its decision, or adopt some third approach. *See NLRB v. HMO International/California Medical Group Health Plan, Inc.*, 678 F.2d 806, 810–11 (9th Cir.1982).

ENFORCEMENT DENIED; REMANDED.

1. The meaning of a statute is derived first from its language. Unless legislative intent is clearly contrary to the statutory language, the language is ordinarily considered conclusive. *Consumer Prod. Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

The legislative history concerning section 1205 is slight. The parties refer the court to a

FLETCHER, Circuit Judge, concurring.

I concur with the result the majority reaches, but my reasons are different. In my view, the National Labor Relations Board's (Board's) construction of section 1205 of the Postal Reorganization Act (Postal Act), 39 U.S.C. § 1205, cannot withstand scrutiny. I would hold that the statute precludes the Postal Service's giving effect to Dalton's revocation.

Although we accord deference to the interpretation the Board gives to statutes involving labor-management relations, *International Alliance of Theatrical Stage Employees v. NLRB*, 779 F.2d 552, 555 (9th Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986), the courts are the final authority on statutory construction. *See SEC v. Sloan*, 436 U.S. 103, 117–18, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1978) (citations omitted). Section 1205 authorizes the Postal Service, upon the agreement of an employee and the Postal Service, to deduct union membership dues automatically from the employee's paycheck. If the employee makes such an agreement, it "shall be irrevocable for a period of not more than one year." 39 U.S.C. § 1205. The Board asserts that because section 1205 is similar to section 302(c) of the National Labor Relations Act (NLRA), 29 U.S.C. § 186(c), case law under the NLRA controls the irrevocability of an authorization under section 1205. I disagree.

First, the difference in language [1] between section 1205 and section 302(c) is more than minor. Section 302(c) is permissive: it states that an authorization "shall not be irrevocable for a period of more than one year." The provision does not require an authorization to be irrevocable;

conversation between then-Congressman Gerald Ford and Congressman William Ford. Their discussion supports the statutory language to the extent that they consider the authorizations irrevocable, but the Congressmen did not address the precise question of whether resignation from a union is an exception to the general rule.

it merely puts a time limit on the authorization if the parties agree to make it irrevocable. Section 1205, on the other hand, expressly requires irrevocability, although it leaves the time period to the discretion of the parties to the authorization.

The majority argues that despite the "ambiguous" language of section 1205, which it concedes might prevent revocability in typical circumstances, an exception to irrevocability should be made where an employee resigns his or her membership from the union. Under the NLRA, "as a matter of law" the authorization is revoked under these circumstances if dues are a "quid pro quo" for union membership despite an irrevocability clause in the agreement. It is a violation of section 8(b)(1)(A) to continue to withhold dues. *San Diego County District Counsel of Carpenters*, 243 N.L.R.B. 147, 149 (1979) (Campbell); *see also Steelworkers, Local 7450*, 246 N.L.R.B. 878, 882 (1979) (Asarco, Inc.).

These cases, in my view, do not control interpretation of the Postal Act. The Postal Act adopts the NLRA only insofar as no provisions of the NLRA conflict with the provisions of the Postal Act. 39 U.S.C. § 1209(a). In this case, even if we were to apply the NLRA to provisions of the Postal Act, we would have to overcome the express Congressional mandate of section 1205.[2]

Support for the position that the Postal Service may continue to withhold dues even though an employee resigns from his or her union is furnished by the historical context in which section 1205 was passed. Before the Postal Act, labor relations in the Postal Service were governed by two Executive Orders generally applicable to the federal sector: Exec. Order No. 10,998, 27 Fed.Reg. 551 (1962) and Exec. Order No. 11,491, 34 Fed.Reg. 17,605 (1969). Exec. Order No. 11,491, § 21 provides that an employee may sign check-off authorizations "which shall include provision for the employee to revoke his authorization at stated six-month intervals." The authorization terminates when

> (1) the dues withholding agreement between the agency and the labor organization is terminated or ceases to be applicable to the employee; or
>
> (2) the employee has been suspended or expelled from the labor organization.

34 Fed.Reg. at 17,614.

That the Executive Order did not include membership resignations, but did include the similar circumstances of suspension or expulsion, would indicate that a resignation was not grounds for termination. The Federal Labor Relations Authority recently construed 5 U.S.C. § 7115, which essentially[3] codified this section of Exec. Order No. 11,491, and held that an employee who resigned from his union because he switched trades within his job and joined another more applicable union was unable to revoke his authorization. *Portsmouth Naval Shipyard*, 19 F.L.R.A. No. 77 (Aug. 12, 1985).

The purposes of authorizing the irrevocable check-off agreements would be undermined if we were to make an exception in this case. By authorizing irrevocability, section 1205 decreases record-keeping for the Postal Service. Irrevocability also enables a union to plan its finances with greater accuracy. The fact that a union member decides to withdraw from the union does not diminish the force of these policies.

I conclude that section 1205 requires that the check-off agreement be irrevocable

---

**2.** Read in context, the words "member" and "dues" simply refer to the employee's status at the time of authorization and to the purpose for which the employee authorized the withholding of funds.

**3.** Section 7115 changed the language from the authorization "terminates" to the authorization "may not be revoked for a period of one year."

Because Congress was considering "termination" in passing section 1205, it is conceivable that Executive Order 11,491 does not speak to whether a resignation was grounds for revocation. At a minimum, however, the order indicates that Congress was aware that circumstances arose in which employees left their unions, and did not alter its mandatory language.

even when a member resigns his or her membership.[4]  Accordingly, I concur.

---

**4.**  The Board argues also that irrevocability is at least a partial restriction upon an employee's right to resign from union membership and that restrictions on the right to resign violate the NLRA.  I do not consider this argument because it was not a basis of the Board's decision. A Court of Appeals may not permit the Board's

General Counsel to substitute a *post hoc* rationale for the Board's own reasoning.  *NLRB v. Metropolitan Life Insur. Co.*, 380 U.S. 438, 442–44, 85 S.Ct. 1061, 1063–64, 13 L.Ed.2d 951 (1965); *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).