Ronald STONE and All Other Persons Similarly Situated, Plaintiffs,

v.

SAXON & WINDSOR GROUP LTD. and Carter, Rodgers & Whitehead, a wholly-owned subsidiary thereof, Defendants.

No. 79 C 2082.

United States District Court, N. D. Illinois, E. D.

Jan. 8, 1980.

Fred I. Shandling, Ardell & Shandling, Ltd., Chicago, Ill., for plaintiffs.

Charles J. Hecht, New York City, Joseph H. Spiegel, Chicago, Ill., for defendants.

MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

The named plaintiff in this case, Ronald Stone, has brought this action to enforce certain provisions of the Commodity Exchange Act, as amended, 7 U.S.C. § 1 *et seq.* (1978) ("the Act").[1] The complaint alleges that the defendants herein entered into op-

---

1. Stone asserts his claims on behalf of all other persons similarly situated as well. The Seventh Circuit rule is that determination of class certification should precede consideration of the merits of an action. *Vickers v. Trainor,* 546 F.2d 739, 747 (7th Cir. 1976). Since this opinion will address the issue of implied rights of action under the Act, a question concerning the subject matter jurisdiction of the Court, it is unnecessary to resolve the class certification issue.

tion contracts with the plaintiff for the sale of gold or silver bullion or Kruggerands in violation of sections 4c(b) and 4c(c) of the Act, 7 U.S.C. §§ 6c(b), 6c(c).[2] The defendants have moved to dismiss the complaint on the ground that private parties lack standing to sue for violations of the Act. For the reasons that follow, the Court agrees that there is no implied private right of action to enforce these particular provisions of the Act. Accordingly, this action must be dismissed pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction.[3]

## The History of Commodities Regulation

Federal regulation of the commodities futures market began in 1922 as the result of discontent by farmers about the adverse impact of speculative activity on the price of agricultural products.[4] The Grain Fu-

**2.** 7 U.S.C. § 6c(b) provides in relevant part:
(b) No person shall offer to enter into, enter into, or confirm the execution of, any transaction subject to the provisions of subsection (a) of this section involving any commodity regulated under this chapter, but not specifically set forth in section 2 of this title, prior to the enactment of the Commodity Futures Trading Commission Act of 1974, which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe within one year after the effective date of the Commodity Futures Trading Commission Act of 1974 unless the Commission determines and notifies the Senate Committee on Agriculture, Nutrition, and Forestry and the House Committee on Agriculture that it is unable to prescribe such terms and conditions within such period of time: *Provided*, That any such order, rule, or regulation may be made only after notice and opportunity for hearing: *And provided further*, That the Commission may set different terms and conditions for different markets.
7 U.S.C. § 6c(c) provides in relevant part:
(c) Notwithstanding the provisions of subsection (b) of this section, no person may, after the enactment of the Futures Trading Act of 1978, offer to enter into, enter into, or confirm the execution of any commodity option transaction involving any commodity regulated under this chapter but not specifically set forth in section 2 of this title prior to the enactment of the Commodity Futures Trading Commission Act of 1974, until (1) the Commission transmits to the House Committee on Agriculture and the Senate Committee on Agriculture, Nutrition, and Forestry documentation of its ability to regulate successfully such transactions, including a copy of the Commission's proposed rules and regulations, and (2) the expiration of thirty calendar days of continuous session of Congress after the date of such transmittal. The Commission is not precluded from transmit-

ting, at any time, documentation relating to its ability to regulate such transactions regarding individual commodities, classes of commodities, or regulation of such transactions on specific boards of trade. Nothing in this subsection shall affect any rights or obligations arising out of any transactions subject to the provisions of this subsection entered into, or the execution of which was confirmed, prior to October 1, 1978: *Provided*, That this prohibition shall not apply to any transaction expressly permitted under rules or regulations prescribed by the Commission before or after September 30, 1978, to be offered to be entered into, entered into, or confirmed, in which the purchaser is a producer, possessor, commercial user of, or a merchant handling, the commodity involved in the transaction, or the products or byproducts thereof.

**3.** The defendants also have moved for dismissal on the grounds that (1) venue is improper under Fed.R.Civ.Pro. 12(b)(3); (2), the complaint fails to state a claim for relief as required by Fed.R.Civ.Pro. 12(b)(6); and (3) the plaintiff is an inappropriate class representative under Fed.R.Civ.Pro. 23(a). The defendants in the alternative asked that the Court transfer venue of this case to the United States District Court for the Eastern District of New York. The Court's determination that it lacks subject matter jurisdiction over this case renders a decision on these issues unnecessary.

**4.** A brief sketch of the mechanics of the commodities market is in order. A commodity is a tangible product that generally is produced and sold in volume. Examples of commodities are grains, other foodstuffs, and precious metals, such as silver and gold. A futures contract is essentially an agreement between buyer and seller to exchange a quantity of commodities for a specified price at a designated time in the future. The commodities exchanges, or contract markets, are the mediums through which these transactions are consummated. Broadly speaking, the commodities market serves two important functions. First, it provides a method for the efficient distribution of goods. Commodities purchasers, for example, can transact

tures Act of 1922 licensed "contract markets," the exchanges in which future delivery of commodities are transacted, and required these markets to promulgate rules to prevent price manipulation.[5] The 1936 amendments to the statute retitled the legislation the Commodity Exchange Act, and extended the coverage of the Act to include futures trading of foodstuffs other than grains. The Act's provisions also were extended to cover traders in commodities as well as members of contract markets. In addition, price manipulation was made a criminal offense for the first time. Although authority to enforce the Act's provisions was vested in the Department of Agriculture, the essential philosophy of the legislation was one of self-regulation by the contract markets.[6]

By the early 1970's, however, the inability of the markets to satisfactorily regulate themselves became apparent. By 1974, the annual value of futures traded had reached $500 billion,[7] thereby magnifying the potential impact that excessive speculation could have on the price of commodities. In light of the increased trading contract markets

lacked the capability, as well as the will, to enforce vigorously the provisions of the Act. H.R.Rep. No. 975, 93d Cong., 2d Sess. 46 (1974). Thus, Congress deemed it necessary to strengthen federal regulation so as

> to further the fundamental purpose of the Commodity Exchange Act in insuring fair practice and honest dealing on the commodity exchanges and providing a measure of control over those forms of speculative activity which often demoralize the markets to the injury of producers, consumers, and the exchanges themselves.

S.Rep. No. 1131, 93d Cong., 2d Sess. 1 (1974), U.S.Code Cong. & Admin.News 1974, p. 5844. To achieve this goal, the Commodity Futures Trading Commission Act of 1974 significantly altered the statutory scheme of commodities regulation. First, a new federal commission—the Commodity Futures Trading Commission (CFTC)—was created and vested with exclusive jurisdiction over commodities futures trading. 7 U.S.C. § 2.[8] While contract markets still possessed certain regulatory responsibility,

for future shipments of goods to coincide with their projected production needs. Second, the market provides a mechanism for shifting the risk of price fluctuations from producers and consumers to speculators who are willing to bear the risk in return for an opportunity to profit from a favorable price fluctuation.

Although some speculation in commodities futures is inevitable and desirable, excessive speculation may distort the price patterns that normally would result from the interplay of supply and demand. This could increase the cost of the commodity, to the detriment of both producers and the consuming public. For a more detailed description of the commodities market, see Hudson, *Customer Protection in the Commodities Futures Market*, 58 B.U.L. Rev. 1 (1978); Note, *Private Rights of Action of Commodity Futures Investors*, 55 B.U.L.Rev. 804 (1975).

5. Although the legislation authorized the government to take legal action against price manipulators, limitations and loopholes in the act rendered this authority ineffectual. S.Rep. No. 405, 95th Cong., 2d Sess. 7–8 (1978). It was the very ineffectiveness of the 1922 Act that led to its substantial revision in 1936.

6. The Act was amended in 1968 to provide for increased penalties for price manipulation and

embezzlement; governmental authority to seek cease-and-desist orders; and to require contract markets to enforce their by-laws and regulations. These amendments, however, did not alter the primary reliance on self-regulation.

7. By 1978, the annual value of commodities traded was in excess of $1 trillion. See S.Rep. No. 405, 95th Cong., 2d Sess. 13 (1978).

8. Prior to the 1974 amendments, both the Department of Agriculture and the Securities and Exchange Commission had exercised jurisdiction over commodities trading. There was a dispute between the House and Senate versions of the 1974 amendments. The House suggested a quasi-independent commission that would share jurisdiction with other federal administrative agencies. The Senate bill, which eventually prevailed, was premised on the notion that only a full-time independent Commission could attract top-notch experts in the field. Moreover, the Senate believed that the peculiarities of the commodities market made it unlikely that either the SEC or the Department of Agriculture could regulate the market properly. S.Rep. No. 1131, 93d Cong., 2d Sess. 19 (1974).

that responsibility was rendered subject to CFTC review and modification.[9]

Second, the scope of the Act was extended to include trading in commodities which theretofore had been unregulated, including gold and silver. Although Congress continued the pre-existing ban on options trading in certain designated commodities, it allowed continued trading in the newly-regulated commodities, subject to administrative rules that would be promulgated by the CFTC. 7 U.S.C. § 6c(a), (b).

Third, the 1974 amendments created an elaborate enforcement scheme for the Act. The CFTC was authorized to bring administrative proceedings against any contract market that failed to enforce its rules, Commission regulations, or the statute's provisions, under which a civil penalty of up to $100,000 could be assessed.[10] 7 U.S.C. § 13a. The CFTC also may file suit in federal district court to enjoin improper behavior by contract markets, and may suspend or revoke an exchange's designation as a contract market, subject to review by the Court of Appeals. 7 U.S.C. § 13a–1, 7b, 8. Similar sanctions, including indictment and criminal prosecution, are available to the CFTC in policing abuses by individual traders.

As part of this enforcement scheme, Congress also created mechanisms through which customers injured by violations of the Act could obtain redress. The Act requires that contract markets devise arbitration procedures which may be used to resolve disputes involving less than $15,000. 7 U.S.C. § 7a(11). Moreover, the 1974 amendments provide for administrative reparations proceedings. 7 U.S.C. § 18. Complaints against registered traders may be filed with the CFTC within two years of the alleged improper conduct. The CFTC then will conduct an investigation and, if the facts developed warrant further action,

designate an administrative law judge to hear the claim.[11] The administrative law judge is empowered to determine the merits of the claim, and to order payment of damages to the aggrieved customer. 7 U.S.C. § 18(e). Such an order is enforceable in the federal district court, and may be reviewed on petition to the court of appeals. 7 U.S.C. §§ 18(f), (g).

Experience with administering the Act as amended in 1974 led to several additional amendments to the Act in 1978, two of which are of particular significance to the issue raised in this case. The Congress added a provision to the Act authorizing the States to bring actions in federal district court to enjoin violations of the Act or CFTC regulations. 7 U.S.C. § 13a–2. The senate report on the amendments noted that "[t]he intent of the section is to provide states with the tools to combat fraudulent and other unlawful behavior directed at their residents." S.Rep. No. 405, 95th Cong., 2d Sess. 25 (1978). The report also observed that utilization of the investigative and prosecutorial capabilities of the States would ease the burden of the CFTC. *Id.* at 26.

The Congress also amended the Act to prohibit options trading in those commodities newly-regulated by the 1974 amendments. 7 U.S.C. § 6c(c). The CFTC already had imposed an administrative ban on such trading based on the finding that "the offer and sale of commodity options in the United States is at present fraught with fraud and other illegal and unsound practices and represents substantial risks to members of the general public." S.Rep. No. 405, 95th Cong., 2d Sess. 24 (1978). This statutory amendment reaffirmed the CFTC ban, and provided a procedure by which the Commission could lift the ban at some point in the future. By giving the CFTC this measure of control, "[t]he con-

---

**9.** *See* 7 U.S.C. § 12a(7).

**10.** Under Section 13a, failure to comply with an administrative determination may lead to criminal prosecution as well.

**11.** *As amended in 1978, this section requires a full-blown administrative hearing only where the amount in issue exceeds $5,000. Where a hearing is not required, the administrative law judge is empowered to determine the merits of the claim on the basis of affidavits and depositions supplied by the parties.* 7 U.S.C. § 18(b).

gressionally-imposed ban on options trading . . . will give the Commission time to get its house in order on futures transactions and make the necessary managerial changes to ensure successful Commission operations." *Id.* at 25.[12]

It is in light of this scheme of commodities regulation that the Court must consider whether an implied private right of action to enforce the ban on options trading may be engrafted upon the statute.

### Implied Private Right of Action

Prior to the 1974 amendments, the Seventh Circuit had held that private individuals could sue to enforce the antifraud provisions of the Act. *Deaktor v. L. D. Schreiber & Co.*, 479 F.2d 529, 534 (7th Cir.), *rev'd on other grounds sub nom., Chicago Mercantile Exchange v. Deaktor*, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973); *see also Goodman v. H. Hentz & Co.*, 265 F.Supp. 440, 447 (N.D.Ill.1967). The Seventh Circuit in two post-1974 decisions has reaffirmed this conclusion. *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96, 103 (7th Cir.

1977); *Case & Co. v. Board of Trade*, 523 F.2d 355, 360 (7th Cir. 1975).

The Court, however, believes that these precedents are not controlling. These decisions all addressed the private enforcement of the anti-fraud provisions of the Act; none reached the question of private enforcement of the ban on options trading. "The source of plaintiff's right must be found, if at all, in the substantive provisions of the . . . Act which they seek to enforce," and not solely by reference to other provisions contained in the statute. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 577, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979) (Supreme Court denies a private right of action to enforce § 17(a) of the 1934 Securities Act despite the past implication of private rights of action under §§ 10(b) and 14(a) of the 1934 Act). Thus, *Touche Ross* requires that the Court conduct an independent inquiry into the validity of an implied private right of action under Sections 4c(b) and 4c(c).[13]

The starting point for any such inquiry, of course, is *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). In that

**12.** The senate report on the 1978 amendments was sensitive to the considerable backlog of reparation claims before the CFTC. S.Rep. No. 405, 95th Cong., 2d Sess 16 (1978). Indeed, the 1978 amendments in large measure were a response to this problem. By imposing a ban on options trading, Congress gave the CFTC "time to get its house in order." To facilitate the time when that would occur, Congress altered the reparation proceedings to dispense with the requirement of a full hearing of claims involving less than $5,000. Finally, to alleviate the heavy enforcement burden placed on the Commission, States were authorized to bring actions to enforce the provisions of the Act.

**13.** Only one other district court has addressed the issue of a private right of action with respect to either of the provisions in issue here. *Kelley v. Carr*, 442 F.Supp. 346 (W.D.Mich. 1977) [upheld a private right of action under section 4c(b)]. With respect to other provisions of the Act, there is a division among the federal district courts as to the existence of a private right of action. The following cases have held that such an action exists: *Smith v. Groover*, 468 F.Supp. 105 (N.D.Ill.1979); *R. J. Hereley & Son Co. v. Stotler Co.*, 466 F.Supp. 345 (N.D.Ill.1979); *Jones v. B. C. Christopher & Co.*, 466 F.Supp. 213 (D.Kan.1979); *Milani v. Conticommodity Services, Inc.*, 462 F.Supp. 405 (N.D.Cal.1976); *Hofmayer v. Dean Witter &*

*Co., Inc.*, 459 F.Supp. 733 (N.D.Cal.1978); *Gravois v. Fairchild, Arabatzis & Smith, Inc.*, Comm.Fut.L.Rep. [CCH] ¶ 20,706 (E.D.La. 1978); *Bache Halsey Stuart, Inc. v. French*, 425 F.Supp. 1231 (D.D.C.1977); *Shearson Hayden Stone, Inc. v. Lumber Merchants, Inc.*, 423 F.Supp. 559 (S.D.Fla.1976). Other cases have denied a private right of action: *Liang v. Hunt*, 477 F.Supp. 891 (N.D.Ill.1979); *National Super Spuds, Inc. v. New York Mercantile Exchange*, 470 F.Supp. 1256 (S.D.N.Y.1979); *Alkan v. Rosenthal & Co.*, Comm.Fut.L.Rep. [CCH] ¶ 20,-797 (S.D.Ohio 1979); *Berman v. Bache Halsey Stuart Shields, Inc.*, 467 F.Supp. 311 (S.D.Ohio 1979); *Bartels v. International Commodities Corp.*, 435 F.Supp. 865 (D.Conn.1977); *Consolo v. Hornblower & Weeks, Hemphill, Noyes*, 436 F.Supp. 447 (N.D.Ohio 1976). Although the issue has been presented to several courts of appeals, all have avoided decision of the question. *See Chipser v. Kohlmeyer & Co.*, 600 F.2d 1061 (5th Cir. 1979); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Goldman*, 593 F.2d 129 (8th Cir. 1979); *Master Commodities, Inc. v. Texas Cattle Management*, 586 F.2d 1352 (10th Cir. 1978); *Moody v. Bache & Co., Inc.*, 570 F.2d 523 (5th Cir. 1978); *Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 567 F.2d 1174 (2d Cir. 1977).

case, the Court outlined the various factors relevant to determining whether a private right of action is implicit in a statutory scheme:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted" . . . that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one . . .? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff . . .? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

422 U.S. at 78, 95 S.Ct. at 2088 (emphasis original).

Although each of these elements may shed some light on the propriety of inferring a private right of action, the Court has made it clear that each factor is not entitled to equal weight. *Touche Ross*, 442 U.S. at 575, 99 S.Ct. at 2489. Indeed, two cases decided during the last term of the Supreme Court suggested that a pivotal determination is whether the plaintiff is a special beneficiary of the statutory scheme. In *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Court found an implied private right of action to enforce Title IX's prohibition against sex discrimination in educational institutions receiving federal financial assistance.[14] Because the Court held that Title IX explicitly conferred a benefit upon victims of sex discrimination, the ambigu-

ous legislative history of Title IX did not militate against the implication of a private right of action:

We must recognize, however, that the legislative history of a statute that does not expressly create or deny a private remedy will typically be equally silent or ambiguous on the question. Therefore, in situations such as the present one "in which it is clear that federal law has granted a class of persons certain rights, it is not necessary to show an intention to *create* a private cause of action, although an explicit purpose to deny such cause of action would be controlling."

99 S.Ct. at 1956 (emphasis original).

By contrast, the presumptions were quite different when a statute failed to single out an identifiable group of beneficiaries. In *Touche Ross*, the Court found that § 17(a) of the 1934 Securities Act did not by its terms confer a right upon any particular class of plaintiffs.[15] In this context, the Court viewed less charitably the silence of the legislative history on the question of private rights of action:

[The plaintiffs] argue that because Congress did not express an intent to deny a private cause of action under § 17(a), this Court should infer one. But implying a private right of action on the basis of congressional silence is a hazardous enterprise, at best. . . . And where, as here, the plain language of the provision weighs against implication of a private remedy, the fact that there is no suggestion whatsoever in the legislative history that § 17(a) may give rise to suits for damages reinforces our decision not to

---

**14.** Title IX, 20 U.S.C. § 1681, provides in relevant part:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied of benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . .

**15.** Section 17(a), 15 U.S.C. § 78q(a), provides in relevant part:

Every national securities exchange, every member thereof, every broker or dealer who

transacts a business in securities through the medium of any such member, every registered securities association, and every broker or dealer registered pursuant to section 78*o* of this title, shall make, keep, and preserve for such periods, such accounts, correspondence, memoranda, papers, books, and other records, and make such reports, as the Commission by its rules and regulations may prescribe as necessary or appropriate in the public interest or for the protection of investors.

find such a right of action implicit within the section.

99 S.Ct. at 2486–2487.

The Court's most recent pronouncement concerning implied private rights of action, however, indicates a de-emphasis of the special benefit element of the *Cort* analysis. In *Transamerica Mortgage Advisors, Inc. v. Lewis*, —— U.S. ——, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the Court refused to infer a private right of action for damages under § 206 of the Investment Advisers Act.[16] There, despite the fact that plaintiff was within the class of persons directly benefitted by § 206, the Court refused to accord the admittedly ambiguous legislative history the same presumption that had prevailed in *Cannon*. "[T]he mere fact that the statute was designed to protect advisors' clients does not require the implication of a private cause of action for damages on their behalf." —— U.S. at ——, 100 S.Ct. at 249. Instead, the Court focused on the elaborate framework of administrative judicial vehicles for the enforcement of § 206, concluding that "[i]n view of these express provisions . . . it is highly improbable that 'Congress absentmindedly forgot to mention an intended private action.'" —— U.S. at ——, 100 S.Ct. at 247. Given this scheme, the Court required "persuasive evidence of a contrary legislative intent" in order to infer a private right of action. Finding none, the private right of action theory was rejected without consideration of the final two elements of the *Cort* analysis.[17]

This restrictive application of *Cort*—if, indeed, it can be called an application of that precedent—seems to reflect the growing disenchantment among a number of the justices with the results obtained under the *Cort* analysis. Although the Court itself rarely has inferred private rights of action since the decision in *Cort*, a number of courts of appeals have applied *Cort* liberally to infer private rights of action in a number of statutory schemes.[18] An over-eagerness to find private rights of action implied in statutory schemes suffers the vice of inviting

> Congress to avoid resolution of the often controversial question whether a new regulatory statute should be enforced through private litigation. Rather than confronting the hard political choices involved, Congress is encouraged to shirk its constitutional obligation and leave the issue to the courts to decide.

*Cannon*, 99 S.Ct. at 1981 (Powell, J., dissenting). Moreover, the implication of private rights of action has profound consequences with respect to the allocation of administrative and judicial resources. This is particularly so where, as in *Transamerica*, the statutory scheme has an elaborate network for enforcement. In these situations, Congress already has made an explicit determination as to the instances when administrative, rather than judicial, enforcement of the statute is desirable. In the face of such a

---

**16.** Section 206, 15 U.S.C. § 80b–6, provides in relevant part:

> It shall be unlawful for any investment advisor, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
> (1) to employ any device, scheme, or artifice to defraud any client or prospective client;
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;
> (3) . . . knowingly to sell any security to or purchase any security from a client . . . without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction.
> . . . .

> (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative.

**17.** —— U.S. at ——, 100 S.Ct. at 247. The Court followed the same procedure in *Touche Ross*. *See* 442 U.S. at 575, 99 S.Ct. at 2489. In both cases, the Court held that satisfaction of the final two factors in *Cort*—the utility of a private right of action and the fact that the action is not one traditionally controlled by state law—would be inadequate to support the implication of a private right of action.

**18.** For a compilation of these decisions, *see Cannon*, 441 U.S. at 740–41, 99 S.Ct. at 1980–81 (Powell, J., dissenting).

determination, only the most "persuasive evidence of a contrary legislative intent" should be sufficient to militate in favor of an implied private right of action.

Accordingly, the Court will apply the *Cort* test as modified by *Transamerica* to Sections 4c(b) and 4c(c) of the Act to determine whether an implied right of action exists. The Court first will examine the statutory scheme of enforcement under the Act. This will be followed by an analysis of the statutory language to ascertain whether the plaintiff herein is within the class of persons specifically benefitted by these sections of the Act; and of the legislative history to determine whether there is support for the proposition that Congress intended that a private right of action should exist. Only if these factors do not preclude the existence of a private right of action will the Court address the remaining elements of the *Cort* analysis.

A. *The Statutory Scheme of Enforcement*

As indicated above, one of the major modifications of the 1974 amendments to the Act was the creation of an elaborate scheme for enforcement of its various requirements. The Act empowers the CFTC to bring administrative proceedings against contract markets and individual traders, while retaining federal court jurisdiction in certain instances.[19] In addition, the Act provides two specific methods by which aggrieved customers may obtain redress: voluntary arbitration of disputes involving less than $15,000, and administrative reparation proceedings before administrative law judges.[20] Federal court jurisdiction is limited to district court enforcement or appellate review of reparation awards. Finally, the Act not only specifically delimits the instances in which enforcement of the Act may be obtained in federal court, it also identifies the parties who may bring such proceedings. Under the 1978 amendments, the States, as well as the CFTC, may bring suit in federal court to enjoin violations of the Act. Criminal indictments against contract markets and individual traders may be brought by the CFTC or the United States Attorney General. The only provision for individual customer actions in federal court are with respect to the enforcement and review provisions contained in the reparations proceeding.

"It is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica,* —— U.S. at ——, 100 S.Ct. at 247. The detailed enforcement scheme created by the 1974 amendments attests to the serious consideration that Congress gave to the question of enforcement of the Act's provisions. This renders it unlikely that Congress "absentmindedly forgot" to include in this scheme a private right of action in favor of customers such as the plaintiff herein.

B. *The Specially Benefitted Class*

At the outset, it should be observed that the scope of this inquiry does not encompass the entirety of the statute. It may well be that certain of the provisions contained in the Act were enacted for the special benefit of customers of the futures market. The question presented by this case, however, is whether Sections 4c(b) and 4c(c), which impose a ban on options trading, were enacted for the special benefit of that class.

The statutory language of these sections in no way suggests that they were designed with the special purpose of protecting customers of the commodities markets. The sections merely prohibit the options trading of certain commodities. This is in sharp contrast to Title IX, which specifies not only conduct that is prohibited but further singles out an identifiable class that is to benefit from the prohibition. Although this difference in statutory language may be subtle, it nonetheless is highly significant. In *Cannon,* the Court observed

> [t]here would be far less reason to infer a private remedy in favor of individual persons if Congress, instead of drafting Title IX with an unmistakable focus on the

19. *See* note 10 and accompanying text, *supra.*

20. *See* note 11 and accompanying text, *supra.*

benefited class, had written it simply as a ban on discriminatory conduct by recipients of federal funds or as a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory practices. 99 S.Ct. at 1954–55. Clearly, there is no "unmistakable focus" on protection of options customers contained in Sections 4c(b) and 4c(c).

Moreover, the entire history of commodities regulation suggests that ensuring the integrity of the market system, rather than merely protecting individual customers, has been the motivating force behind congressional legislation.[21] This also is the case with the ban on options trading, which in part was the result of the CFTC's conclusion that illegal market practices posed risks to "members of the general public." Customers, of course, are members of the general public, and as such, they do benefit from any actions which eliminate improper practices from the market. To satisfy the special benefit aspects of *Cort*, however, plaintiff must be more than the recipient of a benefit conferred upon the general public at large. As observed in *Cannon*, the statute must single out the plaintiff class for *special* protection. In light of the statutory language and the purpose underlying commodities regulation, the Court concludes that customers were not intended to be special beneficiaries of the ban on options trading.

### C. The Legislative History

The foregoing indicates that a neutral reading of the Act's legislative history will be inadequate to militate in favor of an implied private right of action. In this context, where there is a sophisticated statutory scheme of enforcement and where the plaintiff has not been singled out for protection by the provisions at issue, the legislative history must persuasively suggest an intent to create a private right of action in order to satisfy this prong of the *Cort* test.

The Court finds no evidence of such intent either in the 1974 or 1978 amendments to the Act. In the course of the 1974 amendments, Congress considered and rejected provisions that expressly would have granted private individuals a right of action under the Act.[22] In 1978, the issue of a private right of action once again was raised in Congress. One senator observed that the backlog of reparations cases before the CFTC was attributable in part to the "unfortunate position" taken by some district courts that no private right of action was available to customers of the commodity markets. 124 Cong.Rec.-Senate 10537 (remarks of Sen. Huddleston). Congress, instead of remedying the situation by expressly providing private litigants with a right of action under the Act, left the question to be resolved by the courts on a piecemeal basis. This does not mean that Congress was hostile to the creation of a private right of action under the Act. It does indicate, however, that there was no strong congressional intent that such a right of action be a part of the Act.[23] This is particularly so in view of the express congressional authorization of suits by states contained in the 1978 amendments. "Obviously, then, when Congress wished to provide a private

---

**21.** See notes 4–7 and accompanying text, *supra.*

**22.** One such bill that was considered and rejected would have granted a private right of action for non-willful violations, with treble damages available for willful violations. See S. 2837, 93d Cong., 1st Sess. § 505(a) (1973).

**23.** Indeed, the failure of Congress to deal directly with this question underscores the problem with the implied right of action theory pointed out by Justice Powell in his dissent in *Cannon*. Rather than resolve the political issue of whether a right of action for aggrieved customers should be included in the statute. the

Congress appeared content to reserve that question for judicial resolution:

[A]n aggrieved commodity customer will be able to obtain more expeditious treatment of his claim should the customer elect to pursue a claim in reparations rather than proceed to arbitration *or pursue in court the private right of action which has been judicially implied for violations of certain provisions of the Commodity Exchange Act, or which in the future courts may recognize for other provisions of the act.*

124 Cong.Rec.-Senate 10537 (remarks of Sen. Huddleston) (emphasis supplied).

damage remedy, it knew how to do so and did so expressly." *Transamerica*, —— U.S. at ——, 100 S.Ct. at 248; *Touche Ross*, 442 U.S. at 571, 99 S.Ct. at 2487.

The cases in which a legislative intent to create a private right of action has been found rely on two arguments. First, since a private right of action existed prior to the 1974 amendments, Congress should not be presumed to have withdrawn that right in the absence of convincing evidence. Second, these decisions point to the statutory provision stating that nothing "shall supercede or limit the jurisdiction conferred on courts of the United States or any State" to argue that there was no congressional intent to remove from the courts jurisdiction over private suits under the Act. *See* 7 U.S.C. § 2.

With respect to the first contention, the Court believes this view overstates the judicial acceptance of a private right of action under the Act prior to 1974.[24] Moreover, even had a private right of action been universally accepted prior to 1974, this alone would be insufficient to indicate congressional approval of a private right of action. "[W]e are not at all sure that . . awareness at the time of re-enactment would be tantamount to amendment of what we conceive to be the rather plain meaning of the [statutory] language . . ." *Securities and Exchange Commission v. Sloan*, 436 U.S. 103, 121, 98 S.Ct. 1702, 1713, 56 L.Ed.2d 148 (1978). This *caveat* has added meaning in a case such as this, where the 1974 amendments were a substantial modification, rather than mere reenactment, of the pre-existing statutory scheme.

Furthermore, the Court does not agree that Section 2(a) of the Act unequivocally supports an implied private right of action. In relevant part, the provision vests the CFTC with exclusive jurisdiction over the Act. The purpose of this provision was to prevent the CFTC's authority to regulate the commodities market from being diminished by encroachment by other federal or state administrative agencies. This grant of exclusive authority was followed by the proviso that federal and state court jurisdiction was not superceded or limited by the grant of exclusive jurisdiction to the CFTC.

To assume that this proviso constitutes an endorsement of a private right of action, however, begs the essential question. It assumes that federal and state court jurisdiction properly includes purview over private actions under the Act. As explained above, there is no convincing evidence that Congress in fact intended that a private right of action be included. Therefore, Section 2 provides little independent support for a private right of action.

Nor does the fact that the CFTC consistently has interpreted the Act as permitting an implied right of action control this Court's decision.[25] It is true that administrative interpretations by the agency charged with enforcing a law generally are entitled to considerable deference. *United States v. National Association of Securities Dealers*, 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486 (1975). This deference, however, presupposes the existence of expertise with respect to the issue in question. "The narrow legal issue [raised herein] is one peculiarly reserved for judicial resolution, namely whether a cause of ac-

---

24. Prior to the 1974 amendments, only a few federal courts had reached the question of whether a private right of action existed. *See Deaktor v. L. D. Schreiber & Co.*, 479 F.2d 529 (7th Cir.), *rev'd on other grounds sub nom. Chicago Mercantile Exchange v. Deaktor*, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973); *Booth v. Peavy Company, Commodity Services*, 430 F.2d 132 (8th Cir. 1970); *Arnold v. Bache & Co., Inc.*, 377 F.Supp. 61 (M.D.Pa.1973); *Johnson v. Arthur Espey, Shearson, Hammill & Co.*, 341 F.Supp. 764 (S.D.N.Y.1972); *McCurnin v. Kohlmeyer & Co.*, 340 F.Supp. 1338 (E.D.La. 1972); *United Egg Producers v. Bauer Interna-*

*tional Corp.*, 311 F.Supp. 1375 (S.D.N.Y.1970); *Anderson v. Francis I. duPont & Co.*, 291 F.Supp. 705 (D.Minn.1968); *Hecht v. Harris, Upham & Co.*, 283 F.Supp. 417 (N.D.Cal.1968); *Goodman v. H. Hentz*, 265 F.Supp. 440 (N.D.Ill. 1967). Given the undeveloped state of the law on this issue, it hardly can be asserted that a private right of action under the Act was firmly established when the 1974 amendments were enacted.

25. *See* 41 Fed.Reg. 3994 (1976); 41 Fed.Reg. 18472 at n.5 (1976).

tion should be implied by judicial interpretation in favor of a particular class of litigants." *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 41 n.27, 97 S.Ct. 926, 949, 51 L.Ed.2d 124 (1977). Thus, the CFTC interpretation is unpersuasive in the face of the overwhelming evidence weighing against implication of a private right of action.

In light of the foregoing, the Court deems it unnecessary to engage in lengthy analysis concerning the final two elements set forth in *Cort.* The Court finds that Congress has provided an intricate system of enforcing the Act; that customers are not singled out as special beneficiaries of the options trading ban; and that the legislative history evinces no perceptible intent by Congress to include a private right of action. "The dispositive question remains whether Congress intended to create any such remedy. Having answered that question in the negative, our inquiry is at an end." *Transamerica*, —— U.S. at ——, 100 S.Ct. at 249; *Touche Ross*, 442 U.S. at 575, 99 S.Ct. at 2489.[26]

The Court finds that there is no implied private right of action to enforce the options trading ban contained in 7 U.S.C. §§ 6c(b), 6c(c). Accordingly, the Court will grant the motion to dismiss the complaint for lack of subject matter jurisdiction. It is so ordered.[27]

---

**26.** In passing, the Court would observe that the third element of *Cort* is not satisfied in this case. First, a private right of action is unnecessary under the Act due to the various procedures available through which aggrieved customers may obtain redress. This differentiates this statute from those in which no other private remedy is available, *J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), or the aggrieved party is unable to participate personally in the remedial proceedings. *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). *See also, Cannon*, 441 U.S. at 705–706, 99 S.Ct. at 1962–63 n.41.

Second, to the extent that the CFTC has had difficulty in handling its administrative burden, Congress in the 1978 amendments already has addressed the problem. By imposing a freeze on options trading and by authorizing injunctive suits under the Act by the States, Congress has sought to alleviate the Commission's burden.

**27.** The Court notes that this resolution of the case does not deprive the plaintiff of the administrative recourse he has with the CFTC, since a complaint with the Commission for reparations still could be timely filed. *See* 7 U.S.C. § 18(a).