UNITED STATES of America, Plaintiff,

v.

TUENTE LIVESTOCK, et al., Defendants.

No. C–3–94–336.

United States District Court, S.D. Ohio, Western Division.

May 19, 1995.

Patrick Dennis Quinn, U.S. Attorney's Office, Dayton, OH, Douglas Ross, Brian N. Eisen, Robert F. Church, Office of Consumer Litigation, U.S. Dept. of Justice, Washington, DC, Margaret Jane Porter, Food and Drug Admin., Rockville, MD, Robert D. Okun, U.S. Dept. of Justice, Office of Consumer Litigation, Washington, DC, for plaintiff.

Robert John Styduhar, Vorys Sater Seymour & Pease, Columbus, OH, Victor A. Walton, Jr., Vorys, Sater, Seymour & Pease, Cincinnati, OH, for defendants.

DECISION AND ENTRY OVERRULING DEFENDANTS' MOTION TO DISMISS (DOC. #5); DECISION AND ENTRY DECLARING MOOT DEFENDANTS' MOTIONS TO STRIKE CERTAIN DECLARATIONS PERTAINING TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (DOCS. ## 12 AND 18)

RICE, District Judge.

The Defendants in this case, Tuente Livestock, Ronald W. Tuente, and Roger B.

Tuente, buy hogs from farmers (producers) and sell them to slaughterhouses, which, in turn, slaughter and process the animals for ultimate consumption. The Defendants are accused by the United States Food and Drug Administration ("FDA") of delivering to the slaughterhouses swine whose edible tissues are tainted with illegal levels of residue of a certain animal drug known as sulfamethazine. The United States sues under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301, *et seq.* ("the FDCA" or "the Act")), specifically invoking 21 U.S.C. §§ 332(a) and 331(a), which, taken together, permit the Government to seek to enjoin "[t]he introduction or delivery for introduction into interstate commerce of any food ... that is adulterated[.]" (Text is that of § 331(a)). Herein, the United States seeks an injunction to prevent these Defendants from engaging in their business, unless and until they have taken certain actions to ensure the purity of their porkers. The Defendants now seek dismissal of the suit, arguing that live swine are not "food" within the meaning of the Act, and that their business (in which they might be described as "middlemen" between the farmers and the slaughterhouses) does not consist of the "introduction or delivery for introduction into interstate commerce" of their products. Doc. # 5.

■ For purposes of deciding Defendants' motion to dismiss under Rule 12(b)(6), the Court accepts as true all of the factual allegations in the Plaintiff's pleadings, and determines whether "it appears beyond doubt that the [P]laintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). Unless the Court is satisfied that the United States can prove no set of facts entitling it to relief, the motion to dismiss will be denied.

■ In addition, the Court will note at the outset of this opinion that, in considering the Rule 12(b)(6) motion to dismiss, the Court has not considered matters outside the pleadings. The parties will note that extensive reference to legislative history (including congressional hearing testimony) is made in this Opinion. In the opinion of the Court, such reference does not constitute consideration of materials outside the pleadings, for the following reasons. *First,* such materials are not the types of materials noted in Rule 56(c) (such as affidavits and deposition testimony) that may only be considered in the context of a motion for summary judgment. *Second,* it is in the natural course of determining whether a statutory claim for relief is competently stated to examine the statutory language, its context, and its history. To hold otherwise would be to render Rule 12(b)(6) meaningless in the multitude of cases wherein statutory language does not, on its face, provide a rule of decision without reference to its context and legislative history. *Third,* and, perhaps, most importantly, courts routinely consider legislative history—including congressional committee hearings and reports—in deciding motions to dismiss wherein consideration is limited to matters not outside the pleadings. *See, e.g., Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 536–541, 104 S.Ct. 831, 838–841, 78 L.Ed.2d 645 (1984) (legislative history of § 36(b) of the Investment Company Act of 1940 examined to determine propriety of dismissal of derivative suit, for failure to plead in accordance with "demand requirement" of Rule 23.1); *National Ass'n of Pharmaceutical Manufacturers v. Food and Drug Administration,* 637 F.2d 877, 882–888 (2nd Cir.1981) (Friendly, J.) (very extensive discussion of legislative history of FDCA provision (unrelated to this litigation) in affirming Rule 12(b)(6) dismissal).

The facts, taken as true as they are stated in the Complaint, are these. The Defendants purchase live hogs from producers and sell those hogs (still breathing) to slaughterhouses. When the hogs reach the slaughterhouses, they are slaughtered and their edible tissues are shipped in interstate commerce. Between July, 1992, and December, 1993, the United States Department of Agriculture (USDA) found, subsequent to slaughter, that the edible tissues of at least nine hogs supplied by the Defendants contained residues of the animal drug sulfamethazine in excess of the legal limit (0.1 ppm).

In 1987, the United States Food and Drug Administration (FDA) had notified the De-

fendants that swine that they had sold for slaughter had tested above the legal limit for drug residues, that the FDA considered the Defendants to have introduced adulterated food into interstate commerce, and that the Defendants should implement strategies to ensure that the hogs that they purchased from producers did not contain illegal drug residues. The FDA observed the lack of such procedures to ensure that the hogs are not tainted by above-tolerance drug residues, when inspecting the Defendants' livestock operations in September 1987. In October, 1987, Defendant Ronald Tuente provided a written response to the FDA's notice. On January 9, 1988, the FDA replied to Defendants, in writing, that their response was insufficient, and that they should obtain signed guaranties from the producers from whom they purchased, which guaranties would ensure that the swine purchased by the Defendants from said producers (for subsequent sale to slaughterhouses) would be free from above-tolerance drug residues. In subsequent inspections of the Defendants' operations (which occurred in September, 1992, September, 1993, and December, 1993), the FDA never found the Defendants to have obtained such guaranties.

After each of the above referenced inspections, the FDA also notified the Defendants that, in the opinion of the FDA, their failure to implement an adequate identification system, which would permit identification of the producers of any swine found to have above-tolerance residue, rendered them liable for the introduction of adulterated food into interstate commerce, when swine whose producer could not be identified tested above-tolerance.

Aside from the FDA notices concerning the need for guaranties and an effective system for identification of producers, the Defendants also received notification from the USDA on at least twelve occasions between November, 1988, and December, 1993, that the edible tissues of swine that they offered for slaughter were found to have above-tolerance sulfamethazine residues.

There is *absolutely no* allegation that the Defendants, themselves, introduce sulfamethazine into the hogs. Rather, the allegations are that the Defendants purchase swine from producers without obtaining guaranties that the producers have taken the appropriate measures to ensure that the edible tissues of the swine are not contaminated (i.e., that the swine have not been given the drug for the appropriate withdrawal period), and, additionally, that the Defendants do not appropriately mark the swine that they purchase to enable the identification of producers of hogs that are found (in testing after slaughter) to contain illegal residues.

As noted above, the Defendants make two arguments in support of their motion to dismiss: 1) live swine aren't "food," and 2) the Defendants do not engage in "[t]he introduction or delivery for introduction into interstate commerce" of the hogs that they purchase from producers and sell to slaughterhouses. It should be noted at the outset that it is not disputed that *post*-slaughter pork that contains above-tolerance levels of sulfamethazine is adulterated within the meaning of § 331(a).

## I. Are Live Swine "Food?"

The Act, with brazen circularity, defines "food" as:

(1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article.

21 U.S.C. § 321(f). Thus, within the meaning of the Act, food is food. Food is also drink, chewing gum, and components of food, drink, and chewing gum; but, primarily, and in the portion of the definition relevant to this case, food is food. Nothing in the language of statute itself explicitly indicates that live animals raised for slaughter and consumption (such as the hogs in question in this case) either are or are not food (or "articles used for food") within the meaning of the statute.

Only one published[1] case, relied upon by the Government, deals directly with the

---

**1.** The Court would note that the case is not published in the West reporting system, and does

not even appear to be available through the com-

question whether live animals are food within the meaning of the Act. In *United States v. Tomahara Enterprises, Ltd.,* Food Drug Cosm.L.Rep. (CCH) ¶ 38,217 (N.D.N.Y. March 29, 1983), the court determined that live veal calves raised for food were food within the meaning of the statute. Unfortunately, that case is utterly without persuasive value because the court simply decided to take "judicial notice" that the live animals were food within the meaning of the Act. In the opinion of this Court, judicial notice is not an appropriate method for resolution of this disputed question of law.

It appears that the *Tomahara* court based its decision on the opinion of the Second Circuit Court of Appeals in *United States v. O.F. Bayer & Co.,* 188 F.2d 555, 557, (2d Cir.1951), in which that Court of Appeals took judicial notice that coffee (the drink) is made from green coffee beans that have been roasted. On that basis, the Court of Appeals found that there was no evidence required to show that green coffee beans are food within the meaning of the Act. However, it is the opinion of this Court that green coffee beans analogize more appropriately to the carcasses of food producing animals than to the living animals themselves. That is to say, if the *O.F. Bayer* court had found that *live* coffee *plants* were food within the meaning of the act, then the conclusion of the *Tomahara* court (that live veal calves are food) would be supported. Instead, the *Tomahara* court took the *O.F. Bayer* analysis a step further, defining as food not only the harvested (i.e., dead) raw product, but the living creature itself. In the opinion of this Court, that is a significant additional step, and the dealer in pre-harvested (i.e., living) food producing creatures deserves a better explanation for the extension than the mere taking of judicial notice that a living creature is food within the meaning of the statute.

Similarly, the Plaintiff's argument that the Defendants' position (that livestock are not food within the meaning of the Act) "flies in the face of common sense" is not well taken. Doc. # 10 at 2. It is not unreasonable to assert that swine do not become food until they are slaughtered, especially given the absence of any explicit language in the statute and the presence of only a single case on point that would be, at best, persuasive (but not binding) in this jurisdiction.

The Government's strongest (and, ultimately, compelling) argument is the one based on *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In *Chevron,* the Supreme Court explained:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction of the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron,* 467 U.S. at 842–843, 104 S.Ct. at 2781–2782.

In this instance, nothing in the language of the statute, nor in its legislative history, directly addresses the precise question at issue: whether live animals may be considered food within the meaning of the Act. That being the case, "the question for the [C]ourt is whether the agency's answer is based on a permissible construction of the statute." *Id.*

 Unfortunately, while the Government cites *Chevron* (Doc. # 10 at 15), it does not present a developed *Chevron* argument. As far as the Government's brief reveals the history of the FDA's position on this question, it appears that the FDA has considered the livestock in which these particular Defendants trade to be "food" since 1987, and it appears that, in one other case in 1983 (*To-*

puter assisted legal research databases Westlaw and LEXIS.

*mahara* ), the FDA once used a similar interpretation of the statute. In a sense, the Government's almost off-hand reference to *Chevron,* without any supporting citation to agency policy or practice, appears to be an argument that an agency's position for purposes of a particular lawsuit is automatically entitled to deference. If that is the intent of the Government's argument, let it be clear that such a position is untenable. "We have never applied the principle [of *Chevron* ] to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice.... Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate." *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 212–213, 109 S.Ct. 468, 473–474, 102 L.Ed.2d 493 (1988). "[W]e do not defer to positions taken by the agency in the course of litigation[.]" *Franklin Federal Savings Bank v. Director, Office of Thrift Supervision,* 927 F.2d 1332, 1337 (6th Cir.1991).

Thus, in beginning the second phase of a *Chevron* analysis, Court must determine whether it is presented with an agency position worthy of consideration for deference, as opposed to a position taken only for the purpose of litigation. The Government cites no published regulation in which the FDA has explicitly determined that live animals are considered food within the meaning of the Act. The attention of the Court is therefore turned to agency practice; that is, has the agency clearly made an administrative determination that live animals fall within the Act's definition of food, if not by formal published pronouncement, then by established practice? If the agency has engaged in no such administrative practice, then the position taken by the Government herein could be described as one asserted solely for the purposes of litigation, and not entitled to deference. On the other hand, a determination that the agency has established its interpretation of the statute through administrative practice would require deference to that interpretation. If this Court had reference only to the FDA's treatment of these Defendants and to *Tomahara* in answering that question, such a determination would be extremely difficult. It appears, however, that there exists within the legislative history of the Act, itself, evidence that the FDA's position is one of long standing.

In March of 1971, the Intergovernmental Relations Subcommittee of the Committee on Government Operations of the House of Representatives (92nd Congress) held hearings entitled "Regulation of Food Additives and Medicated Animal Feeds." The transcripts of these hearings, at which FDA and USDA officials testified, are reprinted in *A Legislative History of the Federal Food, Drug, and Cosmetic Act and Its Amendments,* Appendix G, p. 610. The statement of Dr. Charles C. Edwards, Commissioner, Food and Drug Administration, contains the following paragraphs:

> *To discharge its obligations under the Federal Food, Drug, and Cosmetic Act, FDA has been pursuing an enforcement program against producers who are reported by USDA to have caused illegal residues.*

> FDA's regulations place upon producers and handlers the responsibility of seeing that their livestock receive the permitted amount of drugs in feed—and only that amount. Producers must be sure that, when necessary, animals are withdrawn from medicated feed in advance of slaughter to insure the elimination of residues in meat.

> Last September, at my request for a legal opinion, counsel ruled that animals offered for slaughter at federally inspected plants which contain unauthorized, unapproved residues will cause the food derived from them to be unsafe and adulterated under Federal law. Interstate shipment of an adulterated product is prohibited. *If, through either willful or unintentional misuse, the drugs are used in such a manner that they cause residues in food, the feeders will be held responsible for causing violations and may be prosecuted for introducing adulterated food into interstate commerce or for causing food to be adulterated while held for sale after shipment in interstate commerce.*

> *As a result of USDA reports, FDA inspectors have made more than 125 on-*

*farm investigations of producers who have been reported as marketing animals with excessive residues.* The purpose of these investigations was to determine reasons for the residues and whether prosecution was warranted.

Early in February of this year, FDA, after studying results of the on-farm investigation program, told its offices that in the future, producers who are reported as having introduced *animals* into interstate commerce with significant residues may be invited to an informal hearing without prior on-farm investigations.

Since the modification of FDA's enforcement policy, five hearings are scheduled with these *producers who have caused residues.* In addition, 15 warning letters have been issued to *producers.*

*Id.* at 794–795 (transcript pages 177–178) (emphases added).[2]

Thus, it appears that the FDA began to take enforcement action against the purveyors of *live animals* as long ago as 1970. Specifically, the FDA has held for approximately 25 years the position that it now takes, that the offering for slaughter of live animals whose edible tissues contain above-tolerance residues exposes the offeror to liability for introducing adulterated food into interstate commerce, and has taken action against other purveyors of live animals in accordance with that position. Accordingly, the Court finds that the interpretation of the FDCA asserted by the Government herein is not an "agency litigating position[ ] that [is] wholly unsupported by regulations, rulings, or administrative practice[,]" and is, therefore, subject to deference if it meets the standard governing the second step of *Chevron* analysis (i.e., if it is "based on a permissible construction of the statute"). *Bowen,* 488 U.S. at 212, 109 S.Ct. at 473–474; *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782.

■ There is practically no legislative history regarding the definition of "food" as used in the Act. The current definition, which has remained unchanged since 1938, "is simply a clarification of the definition in the Food and Drugs Act of June 30, 1906." H.R.Rep. No. 2139, 75th Cong., 3d Sess. 3 (1938), *reprinted in A Legislative History of the Food, Drug, and Cosmetic Act,* Vol. 6, pg. 301. Thus, in order to understand whether Congress would intend the scope of § 331(a) to include live animals, it is not inappropriate to cast an eye upon the 1906 statute and its history.

The 1906 Act defined "food" as including "all articles used for food, drink, confectionery, or condiment by man or other animals, whether simple, mixed, or compound." Federal Food and Drugs Act of 1906, Ch. 3915, 34 Stat. 768, 769. That statutory definition is no clearer with respect to the question herein than is the current definition. As to legislative history directly concerning that definition, there are only the comments of Mr. Gill of Maryland, speaking in opposition to the bill:

> This provision is so comprehensive, so all-embracing that in its application it affects the business operations of a large class of our people and all kinds of articles of food and drugs. It includes the products of our fisheries, the products of almost every garden and farm in the land, and every modification of the natural product when these products enter into interstate commerce. It affects every farmer, every fisherman, every canner, every preserver or modifier of foods, as well as every other person who may become the shipper of any article of food as defined in this bill. Indeed, the magnitude and vastness of its application is commensurate only with our population and the volume of our food production.

40 Cong.Rec. 8981 (1906). Obviously, Mr. Gill's understanding that the statutory definition was "all-embracing" is not binding on

---

2. It may be noted that this passage refers to "producers" and "feeders," which the Defendants are not. This portion of the Opinion, however, is concerned solely with the question of whether live animals may be regulated by the FDA. The fact that the FDA has held producers responsible for introducing adulterated food into interstate commerce supports the proposition that the agency has interpreted the statute to permit the regulation of persons dealing not in post-slaughter products, but in live animals. Without question, the Defendants herein deal in live animals.

this Court, yet there do not appear to be any statements on the record, in either house, that would tend to assuage his fears. That is to say, even the 1906 Congress did not appear to be particularly concerned with limiting or restricting the definition of food.

Rather, the 1906 debates give insight into the intent of the Congress to reach within the scope of the statute whatever party was responsible for the adulteration of products ultimately sold to consumers as food. The written guaranties (from producers) that the FDA allegedly recommended to the Defendants in this case are not novel. The 1906 Act contained a provision essentially similar to the one now codified at § 333(c), which states that a person who has received an article in good faith from another, and who has a signed certificate from that source that identifies the source and that guaranties that the article is not adulterated or misbranded, has a complete defense to prosecution for violation of the Act. 21 U.S.C. § 333(c); 34 Stat. at 771 (1906 Act). *See also* 40 Cong. Rec. 895 (1906) (Senator Heyburn explaining the defense found at § 10 of the bill). The import of this provision is clear: the Congress was not interested in prosecuting innocent persons who pass in commerce items that have been represented to them as pure and properly labeled. The requirement of the signed, identifying guaranty permits enforcing officials to "track down" the party responsible for misbranding or adulterating the food. A party who takes articles without the guaranty, even one who does not actively adulterate or mislabel food, acts in two ways contrary to the intent of the statutory scheme: *first,* that party may be representing food as unadulterated or properly labeled when, in fact, it has no solid basis for making such a representation; and, *second,* such a party, by failing to obtain the identifying documentation, frustrates the ability of the enforcing authorities to discover the party actually responsible for the adulteration or mislabeling of the food.

The statutory scheme thus supports an inference that the Act is meant to be effective as early in the commercial chain as the adulteration or mislabeling is accomplished, regardless of where in the chain—from farmer to slaughterhouse to ultimate consumer—responsibility rests. This inference is supported by resort to legislative history, as well. Senator Heyburn of Idaho, who was the floor manager of the 1906 bill, encapsulated the intent of the legislation in the following remark:

> Mr. President, the principle of the bill is to prevent the manufacture of the forbidden things and the placing of them on the market. At the last session of Congress one of the objections that appeared to me most reasonable to the bill proposed then was that it went to the consumer or retail dealer rather than the manufacturer. In this bill we have undertaken to see, so far as the legislation could do it, that there is no manufacturer to put upon the market and send out these things. That is what we have undertaken. If we relax ... by allowing the manufacturer to do something admittedly wrong in the hope that the wrong may be cured at some period between the mill and the mouth, then you have defeated the purpose of the measure.

40 Cong.Rec. 1133–1134 (1906). That Senator Heyburn's endpoints were "the mill and the mouth" reflects an assumption that the food is adulterated at the mill. Taken as true, the Complaint in this case alleges that these swine became adulterated not at the "mill" (the slaughterhouse), but at the farm; not after slaughter, but while still living. Given that it is reasonable to read one purpose of the statute to be the prosecution of those responsible for the adulteration of food, it is not unreasonable for the FDA to interpret the statute to grant to the agency the authority to pursue dealers in living animals, when it appears that, to reach those responsible for the adulteration of food, the agency must reach those who deal in the animals even before they are slaughtered.

One other point, although not definitive in itself, favors the FDA in this matter. It may be argued that, based upon the 1971 committee hearing transcript cited above, the Congress has been aware of the FDA's understanding and practice concerning live animals for almost twenty-five years, yet has in no way acted to limit the agency's jurisdiction (or prevent its exercise of authority) over dealers in live animals. It is not always the

case that Congress' failure to disapprove of an agency's practice revealed in testimony to a congressional committee may be read as Congress' approval of that statutory interpretation. In *SEC v. Sloan*, 436 U.S. 103, 105, 98 S.Ct. 1702, 1705, 56 L.Ed.2d 148 (1978), the SEC was authorized by statute to issue summary orders suspending trading in any security for ten days. The agency had used that authority to issue summary consecutive ten day suspensions of trading in a particular stock so that the aggregate suspension had lasted over a year. *Sloan*, 436 U.S. at 105–106, 98 S.Ct. at 1705–1706. The practice of issuing consecutive summary suspension orders was one which had been noted and approved (albeit reservedly) in a 1963 Senate committee report. *Id.* at 119–120, 98 S.Ct. at 1712–1713. Commenting on the SEC's argument that the Court should follow Congressional approval of the agency's construction of the statute, the Supreme Court wrote:

> We are extremely hesitant to presume general congressional awareness of [an agency's] construction based only upon a few isolated statements in the thousands of pages of legislative documents. [L]anguage in a Committee Report, without additional indication of more widespread congressional awareness, is simply not sufficient to invoke the presumption [that the agency's construction of its enabling statute is consistent with Congress' intent] in a case such as this. For here[,] its invocation would result in a construction of the statute which not only is at odds with the language of the section in question and the pattern of the statute taken as a whole, but also is extremely far reaching in terms of the virtually untrammeled and unreviewable power it would vest in a regulatory agency.

*Id.* at 121, 98 S.Ct. at 1713. In this case, however, the agency's interpretation is one that is *not* "at odds with the language of the section in question," and is, in the opinion of this Court, *consistent with* "the pattern of the statute taken as a whole." Also, the interpretation does not grant the agency "virtually untrammeled and unreviewable power"—in order to enforce § 331(a), the agency must pursue an action for criminal sanctions or injunctive relief in a competent court. Thus, the Court finds that the Congress' awareness of the FDA's longstanding interpretation of the statute to permit action against those dealing in live animals, and its failure to prevent the FDA from acting upon that interpretation, does favor the agency's position in this case to some extent.

Accordingly, the Court concludes that, in light of the structure of the FDCA and the legislative history of the Act, it is permissible for the FDA to interpret of the term "food," as used in 21 U.S.C. § 331(a), to include live animals raised for food and intended to be offered for slaughter.

Certain arguments of the Defendants contrary to this position require comment. *First*, the Defendants' argument that this is a question of the "plain meaning" of the language of the statute is not well taken. In providing a circular definition (food is food), the Congress built into the statute, whether intentionally or not, a measure of ambiguity. It is not intuitively obvious to this Court that "food" cannot mean live animals raised for food. Indeed, the *Tomahara* court thought precisely the opposite contention to be intuitively obvious, and decided simply to take judicial notice of what it considered to be the fact that living animals raised to produce food are "articles used for food." Accordingly, as stated above, this Court finds the term "food" as used in § 331(a) to be susceptible of more than one reasonable interpretation.

*Second*, the Defendants' argument that it is logically inconsistent for the FDA to classify as food both living animals and their edible tissues is not well taken. Doc. # 5 at 8–10. An article that consists only in part of edible tissue—a rack of pork ribs, for example, which contains both edible tissue (flesh) and inedible tissue (bone)—may certainly be classified as food for purposes of the statute. The sale of tainted pork ribs to the public cannot be allowed to escape regulation merely because only a portion of the article offered actually consists of edible tissue. The FDA's position would be illogical, and the Defendants' argument would have weight, if the two items considered by the agency to be food were mutually exclusive. The animal

and the edible tissue are not mutually exclusive; on the contrary, the edible tissue is a part of the animal. Thus, to say that an animal is food and that its edible tissue is food is not inherently contradictory or logically inconsistent.

As must be apparent from the discussion above, the Court does not agree with the Defendants' argument that the legislative history of the Act supports a restrictive reading of the definition of "food." In fact, there is almost no legislative history at all directly discussing that particular definition. The Defendants do not explain why they believe that a congressionally rejected definition from 1937 ("The term 'food' includes all substances and preparations used for, or entering into the composition of food, drink, confectionery, chewing gum, or condiment for man or animals") was "more expansive" than the definition enacted. Doc. # 5 at 10 (citing *A Legislative History of the Federal Food, Drug, and Cosmetic Act,* 75 Cong., 1st Sess. (1937); Vol. 5, pg. 768). Indeed, that rejected definition is just as ambiguous as the 1906 and 1938 definitions in defining food as food.

The caselaw is, simply, unhelpful. As noted, there appear to be no cases, save *Tomahara,* that address the question whether live animals may properly be considered food within the meaning of § 331(a). *Tomahara,* as previously noted, is not particularly useful, itself. Defendants concede that none of the cases that they cite are factually similar to the case presented herein. Doc. # 11 at 13, n. 3. The question presented herein does not concern an end-product derived from the processing of food items. *See, e.g., Nutrilab v. Schweiker,* 713 F.2d 335 (7th Cir.1983) (starch blocker extracted from bean is a drug, not food). Rather, this case goes in the opposite direction—the Court is concerned with how far *back* in the processing of food, toward the "raw material," the statute reaches, rather than how far *forward* an item can be processed before it loses its quality as food. There are, indeed, cases that have extended the reach of the statute backward to preprocessed items. *See, e.g., O.F. Bayer,* 188 F.2d 555 (green coffee beans, not yet fully processed, are food). The Defendants have cited no case in which the backward

(preprocessing) extent of the statute has been limited. On the other hand, no case (aside from *Tomahara*) has held that the statute actually extends all the way back to the living creature. Thus, this Court is of the opinion that it writes on a relatively blank slate, and is not persuaded that there is any binding or prevailing caselaw (in favor of either party) on this point. The Defendants' argument that the caselaw favors their position over the Government's is not well taken.

In their reply brief, the Defendants cite certain USDA regulations in an attempt to show that the USDA regulations are inconsistent with the FDA's interpretation of the FDCA to permit regulation of living animals. The USDA regulations cited apply the term "adulterated" to "any *carcass,* part thereof, meat or meat food product," and apply the phrase "capable of use as human food" to "any *carcass* or product of a *carcass* of any *livestock* [.]" Doc. # 11 at 10 (citing 9 CFR § 301.2) (emphases not present in regulations, altered from emphases presented in memorandum). From this, the Defendants argue that the USDA regulations indicate that only the carcasses of livestock subsequent to slaughter are properly subject to regulation. However, at 9 CFR § 309.16, the USDA has also promulgated regulations concerning the treatment of livestock (before slaughter) "suspected of having been treated with or exposed to any substance that may impart a biological residue which would make the edible tissues unfit for human food *or otherwise adulterated* [.]" (Emphasis added.) "These livestock may be held ... until metabolic processes have reduced the residue sufficiently to make the tissues fit for human food and otherwise not adulterated." The USDA thus applies the term "adulterated" not only to carcasses, but to the tissues of living animals, and concerns itself with the levels of residues present in the animals prior to slaughter. This regulation is consistent with, rather than in opposition to, the FDA interpretation of its own authority to regulate commerce in living animals under § 331(a).

The Defendants also present certain arguments that adoption of the agency's interpre-

tation would yield absurd results. They cite 9 CFR §§ 325.1(a) and (c), which require "any product which is capable of use as human food" that is moved in commerce to "bear[ ] the official inspection legend[,]" and require transportation of "meat or meat food products capable of use as human food" only in tightly sealed packages or containers. Doc. # 11 at 11 (emphasis, added in memorandum, removed). The Court does not take the Government's argument in this case to be that the USDA should be permitted to apply those regulations to live animals, and any attempt by the USDA to do so would be subject to challenge under *Chevron* as an unreasonable interpretation of the Congress' intent.

Similarly, the Defendants' argue that if live swine were to fall within the definition of "food" for purposes of § 331(a), they would all be adulterated, *per se,* because they carry dirt and manure with them, have digestive tracts containing decomposed substances, and produce excrement. Doc. # 11 at 12. Again, the Court does not understand the Government to be arguing that all live swine are adulterated for purposes of the Act, or that such an interpretation of the statute would be a reasonable one under *Chevron. See also, Penobscot Poultry Co. v. United States,* 244 F.2d 94, 95 n. 2 (1st Cir.1957) (wherein the court noted that "it is not violative of the Act to ship birds in interstate commerce" that have been slaughtered and de-feathered, but not eviscerated, and thus carry fecal matter within their intestines).

Thus, for the reasons stated above, the Court makes the following conclusions of law. *First,* the term "food" as used in 21 U.S.C. § 331(a) is ambiguous to the extent that Congress has not directly spoken to the precise issue of whether live animals, raised for food and intended to be offered for slaughter, may be considered "food" within the meaning of the statute. *Second,* while the Government cites no formal, published regulation of the FDA defining said term to include live animals raised for food and intended to be offered for slaughter, its position is not one taken solely for purposes of convenience in this litigation, but is, rather, supported by historical agency practice. *Third,* given the intent of the Congress, as expressed by the statutory scheme and the legislative history, to permit the FDA to reach persons originally responsible for the adulteration of food, and given the fact (as alleged in the Complaint) that the responsibility for the contamination of some food derived from living creatures may lie with persons who deal with those creatures prior to slaughter, it is not unreasonable for the FDA to interpret the term "food" as used in § 331(a) to include live animals raised for food and intended to be offered for slaughter. The FDA's interpretation of § 331(a) to permit it to act against persons who introduce or deliver for introduction into interstate commerce live swine, intended for slaughter and subsequent use as food, the edible tissues of which contain above-tolerance residues of sulfamethazine, is a permissible interpretation of the statute, and, thus, is entitled to deference under *Chevron.*

Hogs are food.

## II. Do the Defendants Introduce Swine into Interstate Commerce?

■ As noted above, § 331(a) prohibits "the introduction or delivery for introduction into interstate commerce of any food ... that is adulterated or misbranded." The Defendants, who are, essentially, middlemen, argue that the use of the word "introduction" in this clause must refer to the party who initially places the adulterated item into the stream of commerce; in this case, the farmer/producer. (Again, it is not alleged that the Defendants in any way *cause* the adulteration of the hogs that they buy and sell.) The Government disputes this interpretation, but does so by pointing out that *other* clauses of § 331 prohibit the adulteration of food in interstate commerce (§ 331(b)), receipt of adulterated food (§ 331(c)), and the adulteration of food while it is held for sale (§ 331(k)). Arguments based on §§ 331(b), (c), and (k) are unavailing in this case, because of the simple fact that the Government has chosen to proceed on the basis of § 331(*a* ). To say that other subsections might cover the Defendants' activity does not demonstrate that subsection (a) does so.

Even so, despite the linguistic logic of the Defendants' position ("introduction" does, in this Court's opinion, tend to imply an *initial* encounter), the Court finds that the Congress has directly indicated that a party who has purchased an adulterated article from another party and who, in turn, passes it on to another, may yet be held liable under § 331(a). Section 333(c), which is the provision that provides a complete defense to a party who has obtained a written guaranty, contemplates the provision of such a defense to a party prosecuted under § 331(a). 21 U.S.C. § 333(c)(2). If Congress had intended that only the party who introduces an article into the stream of commerce be subject to § 331(a), then it would not have provided for the written guaranty defense in § 333(c)(2), as such a party could not, by definition, have "received" the article if that was the party who actually first introduced the item into the stream of commerce.

Accordingly, while the Defendants' position is sensible on its face, it appears that Congress specifically contemplated that parties who receive items from other parties (including "middlemen" such as the Defendants herein) may yet be subject to the prohibitions of § 331(a).[3]

Wherefore, for the reasons stated above, the Defendants' Motion to Dismiss (Doc. # 5) is overruled. It cannot be said that the Plaintiff can prove no set of facts in support of its claims which would entitle it to relief.

Also, in that the Plaintiff's Motion for Preliminary Injunction (Doc. # 10) has been overruled as moot (Doc. # 31), Defendants' motions to strike certain declarations pertaining to the motion for preliminary injunction (Docs. ## 12 and 18) are also overruled as moot.

---

**3.** The Defendants do not argue that the swine that they buy and sell are not in interstate commerce, only that they (the Defendants) do not *introduce* the allegedly adulterated animals into interstate commerce.